**IN THE CIRCUIT COURT**
**THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

FILED

2004 MAR 12  AM 9: 38

CLERK OF CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| T.K. PARTHASARATHY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No. 03-L-1253 |
| | ) | |
| T. ROWE PRICE INTERNATIONAL FUNDS, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF THE ARTISAN DEFENDANTS'**
**MOTIONS (1) PURSUANT TO SECTION 2-301 OF THE ILLINOIS CODE OF**
**CIVIL PROCEDURE TO DISMISS FOR LACK OF PERSONAL JURISDICTION,**
**AND (2) IN THE ALTERNATIVE, TO STRIKE AND DISMISS PURSUANT TO**
**SECTION 2-615 OF THE ILLINOIS CODE OF CIVIL PROCEDURE**

Defendants Artisan Funds, Inc. ("Artisan Funds") and Artisan Partners Limited

Partnership ("Artisan Partners") (together, the "Artisan Defendants"), by their attorneys,

respectfully submit this memorandum in support of their motions:

(a)     to dismiss this action as to the Artisan Defendants pursuant to Section 2-301 of

the Illinois Code of Civil Procedure for lack of personal jurisdiction over the Artisan Defendants;

and

(b)     in the alternative, and pursuant to Section 2-615 of the Illinois Code of Civil

Procedure, to strike and dismiss the claims in Counts I and II of the First Amended Complaint

(the "Complaint"), which are the only counts directed against the Artisan Defendants, on the

ground that such claims are substantially insufficient in law, and on the ground of misjoinder of

parties.

# I.
# PRELIMINARY STATEMENT

## A.    The Parties

Artisan Funds is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.  (Compl., ¶ 7)  It is an open-end management investment company, commonly called a mutual fund, and as such is registered under the federal Investment Company Act of 1940.  It offers shares in seven series -- one of which is Artisan International Fund ("Artisan International").  (Compl., ¶¶ 7, 11; Affidavit of Janet D. Olsen, submitted in support of the Artisan Defendants' motion to dismiss for lack of personal jurisdiction filed herein on March 1, 2004 ("Olsen Aff."), ¶ 4)

Artisan Partners is a Delaware limited partnership headquartered in Milwaukee, Wisconsin.  (Compl., ¶ 8)  Artisan Partners has investment advisory agreements with Artisan Funds pursuant to which it serves as the investment adviser to each series of Artisan Funds and is responsible for managing and supervising the portfolio securities of each series.  (*Id*).

Neither of the Artisan Defendants is alleged to have any office or other place of business in Illinois, and neither is alleged to have any employees in this State.  Nor do either of the Artisan Defendants have a registered agent for service in Illinois.  (Olsen Aff., ¶ 8)  As appears from the summonses attached as Exhibits A and B to this memorandum, service of process was made upon Artisan Partners at its Milwaukee headquarters, and service of process purportedly was made upon Artisan Funds by leaving a copy with a Chicago attorney who has performed legal services for Artisan Funds (but who, as discussed below, is not and never has been Artisan Funds' registered agent for service of process in civil actions).

Plaintiff Parthasarathy is alleged to be an owner of shares in Artisan International and purports to sue on behalf of himself and a putative class of investors who have owned and held

2

Artisan International shares for more than fourteen days at any time during the five years preceding the filing of suit. (Compl., ¶¶ 11, 46) The other three named plaintiffs are alleged to be investors in two other, unrelated mutual funds, and they have asserted claims only against those mutual funds and their respective investment advisers.[1] They are not alleged to own shares in any Artisan Fund or to have any other connection with the Artisan Defendants. The only commonality among the three pairs of defendants is that each is in the mutual fund industry. More particularly, the Artisan Defendants, the T. Rowe Price Defendants, and the AIM Defendants are *competitors* in the mutual fund industry.

## B.   Summary of the Complaint

The Complaint alleges that shares of open end mutual funds are sold to and may be redeemed by investors at a price based upon net asset value ("NAV") per share. (Compl., ¶ 18) NAV is alleged to be calculated by deducting fund liabilities from the total value of the assets (consisting primarily of portfolio securities and cash) held by the fund, divided by the number of fund shares outstanding. (Compl., ¶¶ 18-19, 43)

The Complaint alleges that defendants were negligent, and "willfully and wantonly breached their duties," in calculating once daily (at 4:00 p.m. EST) the NAV of the shares in their respective funds based upon the last trade price in the home markets of the foreign securities in their portfolios. (Compl., ¶¶ 20, 60, 64) More specifically, plaintiffs contend that the defendants calculate the NAV of fund shares using prices established on foreign securities

---

[1]     Plaintiff Woodbury has asserted claims against T. Rowe Price International Funds, Inc. (issuer of the T. Rowe Price International Stock Fund, in which he is alleged to be an investor) and its investment advisor, T. Rowe Price International, Inc. (the "T. Rowe Price Defendants"). (Compl., ¶¶ 5-6, 12; Compl., Cts. III, IV) Plaintiffs Stuart and Sharon Smith have asserted claims against AIM International Funds, Inc. (issuer of the AIM European Growth Fund, in which they are alleged to be investors) and its investment advisor, AIM Advisors, Inc. (the "AIM Defendants"). (Compl., ¶¶ 9-10, 13; Compl., Cts. V, VI)

exchanges without taking into account information affecting the value of the securities that becomes available after the close of those foreign exchanges. (Compl., ¶¶ 21, 37-38, 44)[2] The Complaint alleges that by purportedly calculating NAV based upon "stale prices," defendants have created opportunities for market timing traders to purchase fund shares at a "discount," or to redeem fund shares at a "premium." (Compl., ¶¶ 43-45, 60, 64)  None of the Artisan Defendants' activities respecting the valuation of Fund portfolio securities or the calculation of NAV takes place in Illinois; to the contrary, all of those activities take place at the Artisan Defendants' headquarters in Milwaukee, Wisconsin, where each of the management and accounting staff personnel involved in the valuation processes are located. (Olsen Aff., ¶¶ 10, 13)

The Complaint alleges that the consequence of trading by "market timers" is that *fund* assets are diluted by a reduction of fund cash, thereby resulting in a dilution of the NAV of shares held by investors such as plaintiffs. (Compl., ¶ 43)  *Fund* assets (and hence NAV) are alleged to be adversely affected by market timing trading in other ways, as well, including increased trading and transaction costs to the *fund,* disruption of *fund* investment strategies, lost opportunity costs and "asset swings." (Compl., ¶¶ 43, 45)  The only injuries alleged in the Complaint are to Artisan International itself; no individual or direct injury unique to plaintiff Parthasarathy (or any other putative class member) is alleged in the Complaint.

## C.   Summary of Grounds for Dismissal

The Complaint in this action should be dismissed for the following reasons:

---

[2]   In particular, plaintiffs appear to contend that in calculating NAV, defendants should have made adjustments to the closing prices of foreign portfolio securities to reflect upward or downward movements in the *U.S.* domestic securities markets based solely upon an alleged "positive correlation between value movements in the United States market and value movements in foreign markets." (Compl., ¶ 22)

4

First, the Court lacks personal jurisdiction over the Artisan Defendants, neither of which maintains any office or other place of business, employees or bank accounts in the State of Illinois, and neither of which is registered to do business in this State. Consequently, the Complaint should be dismissed as to the Artisan Defendants pursuant to Section 2-301 of the Illinois Code of Civil Procedure for lack of personal jurisdiction.

Second, the claims asserted by plaintiff Parthasarathy against the Artisan Defendants are not properly joined with the claims asserted by different plaintiffs against the other defendants in this action. Pursuant to Section 2-404 ("Joinder of Plaintiffs") and Section 2-405 ("Joinder of Defendants") of the Illinois Code of Civil Procedure, a threshold requirement for the permissive joinder of parties is that the claims asserted by or against them must arise out of the same "transaction or series of transactions." 735 ILCS 2-404 and 2-405(a). Here, the claims asserted by the respective plaintiffs against the various fund defendants do not meet this threshold requirement. To the contrary, the respective plaintiffs are alleged to be shareholders in three entirely *different* mutual funds, and there is no allegation (nor could there be any allegation) that their purchases were in any way part of a single transaction or related series of transactions. Consequently, the Complaint must be dismissed for misjoinder pursuant to Section 2-615 of the Illinois Code of Civil Procedure.

Third, the purported state law claims asserted in the Complaint are insufficient in law and should be dismissed pursuant to Section 2-615 of the Illinois Code of Civil Procedure because those claims are preempted by the federal Investment Company Act of 1940, 15 U.S.C. §§ 80a-1, *et seq.* (the "ICA"), and regulations promulgated by the Securities and Exchange Commission (the "SEC") under the ICA. The ICA and SEC regulations establish national standards for the valuation of mutual fund portfolio securities and the calculation of NAV. Applying state tort law

5

to impose separate or different portfolio valuation and NAV calculation requirements, as advocated by plaintiffs in the Complaint, would stand as an obstacle to the achievement of uniform national standards. The Illinois Supreme Court, in keeping with a long line of United States Supreme Court precedent, has squarely held that in such circumstances Illinois common law claims are preempted by the federal securities laws and must be dismissed. Orman v. Charles Schwab & Co., Inc., 179 Ill. 2d 282 (1997).

Fourth, even if plaintiffs' asserted state law tort claims were not completely preempted by the federal regulation of portfolio valuation and NAV calculation, the sufficiency of any such "state law" claims still must be tested against the requirements of federal law. The Complaint in this case recognizes as much through its express acknowledgement and reliance upon "applicable published regulations" effective "[o]n or about January 1, 1965" -- a reference to an SEC rule (SEC Rule 2a-4 under the ICA) which governs the valuation of mutual fund portfolio securities. 17 C.F.R. § 270.2a-4 Absent allegations that defendants valued their portfolio securities and calculated NAV in a manner that violated any requirement or prohibition of federal law, including SEC Rule 2a-4, the Complaint is legally insufficient and fails to state a claim.

Fifth, plaintiff Parthasarathy's claims arising from the Artisan Defendants' alleged failure to "properly" value Fund portfolio securities are derivative in nature, not claims for direct injury to any particular shareholder or putative class of shareholders. That is, the claims that the Artisan Defendants exposed Artisan International to "market timing," resulting in the general dilution of and increased costs to "Defendants' fund assets," belong to the Fund itself and may be asserted only derivatively on its behalf. Because the claims asserted against the Artisan Defendants in Counts I and II of the Complaint are derivative in nature, plaintiff Parthasarathy was required under applicable Wisconsin law to make demand upon Artisan Funds before filing

6

suit. WIS. STAT. § 180.0742. At least since 1991, Wisconsin has not recognized any exceptions to the demand requirement. Consequently, in the absence of any allegation of demand, the Complaint is legally insufficient must be dismissed as to the Artisan Defendants pursuant to Section 2-615 of the Illinois Code of Civil Procedure.

Sixth, the Complaint is insufficient in law because it purports to seek recovery in tort for purely economic loss, contrary to Moorman Manufacturing Company v. National Tank Company, 91 Ill. 2d 69 (1982), and analogous Wisconsin law. No exception to the economic loss doctrine is available to plaintiffs under the facts alleged in the Complaint, requiring dismissal of the claims against the Artisan Defendants.

Finally, under Illinois' fact pleading requirements, Count II fails to plead sufficient facts to support a claim for "willful and wanton" misconduct. Merely appending the words "willful and wanton" to the breach allegations of the Complaint does not somehow create an independent tort claim against the Artisan Defendants, and Count II therefore is legally insufficient for this additional reason.

## II.
## ARGUMENT

### A. MOTION TO DISMISS PURSUANT TO SECTION 2-301 OF THE ILLINOIS CODE OF CIVIL PROCEDURE FOR LACK OF PERSONAL JURISDICTION OVER THE ARTISAN DEFENDANTS

In order for the courts of this state to exercise personal jurisdiction over a nonresident defendant, two criteria must be satisfied: (1) jurisdiction must exist under the Illinois long-arm statute; and (2) the exercise of jurisdiction must comport with state and federal constitutional due process requirements. Campbell v. Mills, 262 Ill. App. 3d 624, 626-27 (5th Dist. 1994) (affirming dismissal of non-resident defendant).

7

The United States Supreme Court has recognized two distinct types of personal jurisdiction: general and specific. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 nn. 8-9 (1984). The character of a defendant's contacts with a forum necessary to support the exercise of personal jurisdiction differs depending upon the type of jurisdiction at issue. For a defendant to be subject to general personal jurisdiction, its activities within the forum must be "continuous and systematic," such that it is "doing business" within the state. Helicopteros, 466 U.S. at 415-16; Khan v. Van Remmen, Inc., 325 Ill. App. 3d 49, 54 (2d Dist. 2001). Where general jurisdiction exists, it will support the exercise of *in personam* jurisdiction in suits which do not arise out of the defendant's contacts with the state. Spartan Motors, Inc. v. Lube Power, Inc., 337 Ill. App. 3d 556, 561 (2d Dist. 2003). In contrast, specific jurisdiction may exist if a defendant has purposefully directed its activities at a forum state *and* the plaintiff's claims for relief directly "arise out of or relate" to *these same activities*. Helicopteros, 466 U.S. at 414 n.8; Spartan Motors, 337 Ill. App. 3d at 561-62. In either case, the exercise of jurisdiction must comport with constitutional due process standards. Kahn, 325 Ill. App. 3d at 53-54; Campbell, 262 Ill. App. 3d at 626-27.

The plaintiff bears the burden of establishing a *prima facie* case that *in personam* jurisdiction exists. Cleary v. Philip Morris, Inc., 312 Ill. App. 3d 406, 411 (1st Dist. 2000). The Fifth District has stated that "[w]here personal jurisdiction over a nonresident defendant is contested, the plaintiff bears the burden of establishing it by a preponderance of the evidence." Campbell, 262 Ill. App. 3d at 627. In this case, plaintiff Parthasarathy has alleged in conclusory fashion that "[t]his Court has jurisdiction over the subject matter and the parties pursuant to 735 ILCS 5/2-209," without specifying the manner in which the Illinois long-arm statute supposedly justifies the assertion of personal jurisdiction over the Artisan Defendants. (Compl., ¶ 14) There

8

is no allegation that either of the Artisan Defendants has any employees, office or other place of business in Illinois, and in fact they have no presence in this State.  (Olsen Aff., ¶¶ 6-8) Moreover, plaintiff Parthasarathy's allegations concerning the Artisan Defendants' "contacts" with the State of Illinois either are factually incorrect or legally insufficient under 735 ILCS 5/2-209 and the United States and Illinois Constitutions to subject the Artisan Defendants to *in personam* jurisdiction in this Court.

### 1.    The Court Lacks General Jurisdiction Over the Artisan Defendants

"No bright line test exists for determining whether a corporation is doing business in Illinois." Khan, 325 Ill. App. 3d at 54.  However, "[i]t is well established that to qualify as 'doing business' a corporation's business activity in the state must be fairly permanent and continuous, not occasional or casual." *Id.*  "[T]the standard is quite high," and requires more than the solicitation of business within the State.  Rokeby-John v. Derek Bryant Ins. Brokers, Ltd., 230 Ill. App. 3d 308, 318-19 (1st Dist. 1992). *See also* Cook Assocs., Inc. v. Lexington United Corp., 87 Ill. 2d 190, 201 (1981) ("doing business" for jurisdictional purposes "has consistently been held as requiring activities greater than solicitation by employees who only have authority to solicit business in this State").

As an initial matter, plaintiff Parthasarathy has acknowledged that neither of the Artisan Defendants is organized under the laws of the State of Illinois, and that each defendant has its principal place of business in Milwaukee, Wisconsin. (Compl., ¶¶ 7-8)  Moreover, as set forth in the Affidavit of Janet D. Olsen, neither of the Artisan Defendants has any employees, office or other place of business located in the State of Illinois.  (Olsen Aff., at ¶ 8)  All of the administration, operations, compliance, accounting, information technology and legal personnel of the Artisan Defendants are located at the Companies' Milwaukee headquarters.  (*Id.* at ¶ 7)

9

Neither Artisan Partners nor Artisan Funds maintains a bank account in Illinois, and none of the Companies' business records are maintained in this State. (*Id.* at ¶ 8)

Consistent with the absence of business operations within Illinois, neither of the Artisan Defendants is qualified to do business in this State. (*Id.* at ¶ 8) And, although the Complaint alleges that Artisan Funds is registered "as a mutual fund in the State of Illinois" and has "consented to the jurisdiction of Illinois courts" (Compl., ¶ 7), this allegation is erroneous as a matter of law. The Illinois Securities Law of 1953 provides for the registration of the *securities* issued and offered for sale by a mutual fund, not for the registration of *mutual funds*. *See* 815 ILCS 5/7. Moreover, the consent to service of process which follows from the registration of *shares* under the Act is not a general "consent[] to the jurisdiction of Illinois courts." (Compl., ¶ 7) Rather, it is a consent to service of process on the Illinois Secretary of State in actions "arising out of or founded upon the offer or sale of securities *in alleged violation of this Act....*" 815 ILCS 5/10(A) (Emphasis supplied) Here, plaintiff Parthasarathy has *not* asserted a statutory claim under the Illinois Securities Law, nor did plaintiff purport to serve either Artisan Partners or Artisan Funds in the manner specified in the Securities Law. 815 ILCS 5/108(2). To the contrary, as appears from the summonses attached as Exhibits A and B to this memorandum, plaintiff served Artisan Partners by service of process on Artisan Partners' registered agent in Wisconsin, and purported to serve Artisan Funds by leaving a copy of the summons at the office of a Chicago attorney who has performed legal services for Artisan Funds. (Olsen Aff., ¶ 8)[3] Consequently, *in personam* jurisdiction cannot be predicated upon the Illinois Securities Law.

---

[3]     Cameron S. Avery, the attorney who was served with summons and complaint in this action as the purported registered agent for service for Artisan Funds, is an attorney in private practice who routinely performs legal services for Artisan Funds and other clients. He is not and never has been the Company's registered agent for service of process in civil actions, nor has Artisan Funds ever authorized Mr. Avery to accept service of process in civil actions on its behalf. (*See* Olsen Aff., ¶8) Neither of the Artisan Defendants has a registered agent for service of process in Illinois. (*Id.*)

Beyond this, the fact that a nonresident corporation deals with Illinois residents does not in itself mean that the corporation is "doing business" in Illinois. Khan, 325 Ill. App. 3d at 55 (despite placing employees in Illinois jobs, nonresident employment agency with no permanent presence in Illinois was not "doing business" in the state). If the law were otherwise, every large (and small) corporation would be subject to personal jurisdiction in every state in which its customers happen to reside, whether or not the cause of action alleged arose out of its customer contacts. This is not the case: it is well-established that contacts such as advertising in a state, the "mere solicitation" of business from state residents, and even travel to a state for business purposes, are not a sufficient basis for the assertion of general jurisdiction. Skoot v. State St. Bank & Trust Co., No. 97 C 50126, 1997 WL 792985, *4 (N.D. Ill. Dec. 22, 1997) (nonresident bank which acted as custodian of mutual funds registered to do business in Illinois was not subject to personal jurisdiction on negligence claim even though it had Illinois customers and engaged in a national advertising campaign that might solicit customers in this State); Spartan Motors, 337 Ill. App. 3d at 562 (nonresident manufacturer with Illinois contacts was not subject to personal jurisdiction).

Similarly, the fact that Artisan Funds offers securities issued by Artisan Funds, including shares of Artisan International, to the public for investment purposes does not constitute "doing business" within the State of Illinois. In Behm v. John Nuveen & Co., Inc., 555 N.W.2d 301 (Minn. Ct. App. 1996), the Minnesota Court of Appeals affirmed the dismissal of a class action brought on behalf of shareholders of the Nuveen Municipal Value Fund for lack of personal jurisdiction over an investment banking firm that created the fund, the fund's investment adviser, and certain officers and directors of the fund. Applying a long-arm statute similar to Illinois', the court held that the fact that the corporate defendants had entered Minnesota to incorporate 58

11

separate investment funds, all of which were operated from another state, and to "sell billions of dollars of shares" was insufficient to establish either general or specific personal jurisdiction over the incorporators. *Id.* at 307-08. Accordingly, the fact that shares in Artisan Funds series are offered for sale and may be purchased by Illinois residents, such as plaintiff Parthasarathy, is not sufficient to establish that Artisan Funds is doing business in Illinois and subject to personal jurisdiction, much less that Artisan Partners -- the Wisconsin investment adviser to Artisan Funds -- is doing business in this State.

Finally, the operation of a website accessible by Illinois residents is not sufficient to permit the exercise of personal jurisdiction over either of the Artisan Defendants. In this case, plaintiff alleges that Artisan Partners operates an "interactive" website to communicate with its shareholders, including shareholders in Madison County, Illinois, "regarding the performance of the Fund and the investments it manages." (Compl., ¶ 8) However, the use of a website to advertise services and provide a means for customers to contact a non-resident defendant does not support the exercise of personal jurisdiction under Illinois law. Forrester v. Seven Seventeen HB St. Louis Redevelopment Corp., 336 Ill. App. 3d 572, 581 (4th Dist. 2002) (website that advertised services and provided a means for customers to contact defendant and make hotel reservations was not qualitatively different from an advertisement in any other medium that provides a phone number or other means to contact advertiser). *See also* Gordon v. Tow, 148 Ill. App. 3d 275, 281 (1st Dist. 1986) (numerous telephone calls and letters sent into Illinois insufficient to support the exercise of jurisdiction). That is precisely the case here, where the website provides information to investors and identifies means of communication that may be employed to ·purchase shares or obtain account information.[4] Moreover, investors are not

---

[4]     As appears from the website excerpts attached hereto as Exhibit C, the website establishes the following protocols regarding communications with shareholders: (1) in order to open a new account,

12

permitted to purchase Fund shares via the website. (Olsen Aff., ¶ 14) Instead, to open an account and purchase shares investors must complete an account application and mail or overnight the application, together with a check or money order for the amount of the investment, to Artisan Funds' transfer agent in Boston, Massachusetts. (*See* Ex. C) This is precisely how plaintiff Parthasarathy opened his Artisan International account. (Olsen Aff., ¶ 4)

Accordingly, the Artisan Defendants are not "doing business" within the State of Illinois and are not subject to general jurisdiction in an Illinois court.

### 2. The Court Lacks Specific Jurisdiction Over the Artisan Defendants.

#### a. Plaintiff Parthasarathy's Claims Do Not Arise Out of the Transaction of Business by the Artisan Defendants in Illinois

In order to establish the existence of personal jurisdiction based upon the "transaction of business" prong of the long-arm statute, a plaintiff must show that a defendant actually transacted business in Illinois and that the plaintiff's cause of action arose from this transaction. Gaidar v. Tippecanoe Distribution Serv., 299 Ill. App. 3d 1034, 1045-46 (1st Dist. 1998). "The usual 'transaction of any business' to which the provision applies is the negotiation, making, or execution of a contract," Heil v. Morrison Knudsen Corp., 863 F.2d 546, 549 (7th Cir. 1988), and hence in applying this provision the courts have looked to factors such as: (1) who initiated the transaction; (2) where the transaction was entered into; and (3) where a contract was performed. Dombrowski, 258 Ill. App. 3d at 667. A corporation's communications with shareholders who happen to be located within Illinois do not constitute the transaction of

---

interested persons must complete an application and mail it to Boston; (2) to obtain current account information by telephone, shareholders must initiate a telephone call to a customer service representative at a toll-free number; (3) in order to be able to view the investor's own account information over the internet, the shareholder must enroll in a program establishing that privilege; and (4) to receive delivery of fund documents (prospectuses and reports to shareholders) by email, a shareholder must request that the information be provided in that fashion. The website vendor which hosts the website is located in Milwaukee, Wisconsin. (Olsen Aff., ¶ 14)

business under the long-arm statute.  Young v. Colgate-Palmolive Co., 790 F.2d 567, 570 (7th Cir. 1986) (affirming dismissal based on lack of jurisdiction over nonresident directors in shareholder derivative action arising out of the adoption of "poison pill" anti-takeover plan at Colgate-Palmolive's corporate headquarters in New York).

Here, there is no basis for the assertion of specific personal jurisdiction under the "transaction of business" prong of the long-arm statute because plaintiff Parthasarathy's claims do not arise out of a commercial transaction that either of the Artisan Defendants entered into within the State of Illinois.  This is the case both because plaintiff Parthasarathy's purchase of Artisan International shares did not take place in Illinois, and because (according to plaintiff's most recent statements on the subject) his claims do not arise out of his purchase.

As to the first point, plaintiff Parthasarathy became an investor in Artisan International after submitting an account application form to the Funds' transfer agent in Boston, Massachusetts.  (Olsen Aff., ¶ 4)  Thus, plaintiff (not the Artisan Defendants) initiated the transaction, and -- whether the transaction is viewed as having been entered into in Massachusetts (where the transfer agent is located) or in Wisconsin (where the Artisan Defendants are located) one thing is clear:  it was not entered into in Illinois.  That Mr. Parthasarathy may have initiated the transaction from Illinois is irrelevant, since only the acts of the defendant, not the plaintiff, may be considered in determining whether the "transaction of business" test is met.  Gordon v. Tow, 148 Ill. App. 3d 275, 280 (1st Dist. 1986).

Second, plaintiff Parthasarathy has taken the position that his claim does not arise out of his purchase of Artisan International shares, and that he (and the putative class he purports to represent) are suing only as "holders" of shares.  (Memorandum in Support of Plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction, filed November 20, 2003, at 14, 16)

14

According to plaintiff, his claim relates to the valuation of portfolio securities and the calculation of Fund NAV -- activities which the Artisan Defendants performed exclusively in Wisconsin. *See* Heil, 863 F.2d at 549-550 (even if corporate board's adoption of "poison pill" plan in Illinois constituted transaction of business in this State, it was not sufficiently related to his claim for breach of fiduciary duty to satisfy the "arising from" requirement).    Simply put, plaintiff's claims, as he has characterized them, do not "*directly arise* out of the specific contacts between [the Artisan Defendants] and the forum state." RAR, Inc. v. Turner Diesel, Ltd, 107 F.3d 1272, 1278 (7th Cir. 1997) (applying federal constitutional law) (internal citations omitted) (emphasis in original).    Consequently, jurisdiction cannot be predicated upon the "transaction of business" prong of the long-arm statute.

> **b.    Plaintiff Parthasarathy's Claims Against the Artisan Defendants Do Not Arise Out of the Artisan Defendants' Commission of Allegedly Tortious Acts Within the State of Illinois**

To determine whether a defendant has committed a tortious act in Illinois within the meaning of the long-arm statute, courts generally consider whether the last act or event necessary to establish the plaintiff's claim occurred in this State. Young, 790 F.2d at 570 (*citing* Green v. Advance Ross Elecs. Corp., 86 Ill. 2d 431, 437-38 (1981)). However, at least where a tort is alleged to have resulted only in economic loss, the fact that the final event giving rise to the claim was a loss sustained in Illinois does *not* confer jurisdiction. As the Fifth District has stated, "an economic loss which is felt in Illinois is not sufficient to confer jurisdiction in Illinois courts when the allegedly tortious act occurred outside of Illinois." Talbert & Mallon, P.C. v. Stokes Towing Co., Inc., 213 Ill. App. 3d 992, 995 (5th Dist. 1991). *Accord* R.W. Sawant & Co. v. Allied Programs Corp., 111 Ill. 2d 304, 312 (1986) ("jurisdiction would not be proper under the tortious-act section of the long-arm statute since an economic loss which is felt in Illinois is not sufficient to confer jurisdiction in our courts when the acts occurred outside of Illinois").

15

Thus, the fact that the economic interests of corporate shareholders may be harmed by allegedly tortious conduct does not mean that a tort was committed wherever a shareholder resides, Young, 790 F.2d at 570-71, since to hold otherwise would "open[ ] the gates of long-arm jurisdiction to every Illinois resident who incurs a loss...no matter how distant the misconduct and circumstances of the loss are from Illinois." Green, 86 Ill. 2d at 439 (Illinois lacked *in personam* jurisdiction over defendant who misappropriated corporate assets and converted them to his own use even though the harm from the reduction of corporate assets was felt in Illinois.) Indeed, adopting a rule subjecting a defendant to *in personam* jurisdiction wherever the economic consequences of conduct are felt would contravene the requirements of due process. *Id.*

Here, both of the tort claims asserted by plaintiff Parthasarathy against the Artisan Defendants relate to the allegedly improper valuation of foreign portfolio securities and the calculation of NAV per share. (Compl., ¶¶ 59-60, 62, 64)  All of the Artisan Defendants' conduct relating to these activities occurred in Wisconsin, and none of it occurred in Illinois. (Olsen Aff., ¶¶ 6, 7, 10-13)  Wisconsin "therefore, was the place of the [alleged] wrongs; their commission cannot reasonably or justifiably be transferred to Illinois by the rationale that their consequence" reduced the value of plaintiff's shares. Green, 86 Ill. 2d at 438.  As a result, *in personam* jurisdiction over the Artisan Defendants cannot be predicated on the theory that they somehow committed a tortious act in Illinois.

### 3. It Would be Constitutionally Impermissible to Exercise Personal Jurisdiction Over the Artisan Defendants in this Case.

The United States Supreme Court has held that even if a defendant has sufficient contacts with a forum to allow the assertion of jurisdiction, it is impermissible for a court to exercise personal jurisdiction over a defendant where requiring the defendant to litigate in the forum state would "offend traditional notions of fair play and substantial justice." International Shoe Co. v.

16

Washington, 326 U.S. 310, 316 (1945).  The Illinois Supreme Court similarly has observed that the Illinois Constitution limits the exercise of jurisdiction to cases in which it is fair, just and reasonable to require a non-resident defendant to defend an action in this State.  Rollins v. Rollins, 141 Ill. 2d 244, 275 (1990).

In addressing constitutional restraints on the exercise of *in personam* jurisdiction, courts must consider both the burden placed on a defendant and the forum state's interest in the dispute.  *See* Pilipauskas v. Yakel, 258 Ill. App. 3d 47, 56 (1st Dist. 1994) (reversing denial of motion to dismiss for lack of jurisdiction where Illinois had no "substantial interest" in requiring Michigan business to defend lawsuit in Illinois).  *See also* Central States, Southeast and Southwest Areas Pension Fund v. Reiner Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000).  In this case, both considerations weigh against the exercise of personal jurisdiction over the Artisan Defendants.

It is well established that the interests of justice are served by resolving controversies where the conduct complained of by the plaintiff actually occurred.  *See* Mowen v. Illinois Valley Supply Co., 257 Ill. App. 3d 712, 714-15 (5th Dist. 1994) (considering situs of defendant's allegedly negligent acts).   In this case, all Fund administration, operations, compliance, accounting, information technology and legal personnel of the Artisan Defendants are located at the Companies' Milwaukee headquarters.  (Olsen Aff., ¶ 7)  The procedures employed by the Artisan Defendants in evaluating whether events, if any, occurring subsequent to the close of foreign markets should be taken into account in determining the value of portfolio securities held by Artisan International were formulated and are performed at the Companies' headquarters in Milwaukee.  (*Id.*, ¶ 10)  And each of the accounting staff and management personnel involved in these valuation processes, as well as each of the members of Artisan

17

Funds' Valuation Committee, is officed in Milwaukee. (*Id.*, ¶ 13) The State of Wisconsin unquestionably has a strong interest in the adjudication of a dispute concerning the operations of businesses headquartered in that State. *See* Martin v. Heinhold Commodities, Inc., 117 Ill. 2d 67, 82-83 (1987).

In contrast, the only connection the State of Illinois has to this case is plaintiff's residence in Madison County. This interest is diminished by the fact that plaintiff is suing on behalf of a purported class of investors who reside throughout the United States. Moreover, Illinois substantative law will have little, if any, role to play in this litigation.[5] Federal law exclusively governs the valuation of portfolio securities and the calculation of NAV. *See* Section B, 2, *infra*. And, to the extent plaintiff's claims are not entirely preempted by federal law, Wisconsin law will apply to at least some aspects of this case. Newell Co. v. Petersen, 325 Ill. App. 3d 661, 687-88 (2d Dist. 2001) (internal affairs doctrine stems from "the need for the inner workings of a corporation to be governed by a single body of law"). *See also* Edgar v. MITE Corp., 457 U.S. 624, 645 (1982) (only the state of incorporation has the authority to regulate matters among or between corporation and its current officers, directors, and shareholders).

Moreover, the burden which would be imposed upon the Artisan Defendants by a trial of this action in Illinois would be substantial. As discussed above, each of the management and accounting personnel involved in the valuation of portfolio securities and the calculation of NAV are located at the Artisan Defendants' headquarters in Wisconsin. (Olsen Aff., ¶ 6) Requiring these witnesses to attend a trial hundreds of miles away from their homes and places of

---

[5]     Under the circumstances of this case, there is no basis for applying Illinois law across the board to the claims of absent members of a putative class dispersed throughout the country. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821-22 (1985) (courts may apply law of forum state to claims of non-resident class members *only* if forum has "a significant contact or significant aggregation of contacts...creating state interests in order to ensure that the choice of [its] law is not arbitrary or unfair").

18

employment would be costly, time consuming, and would entail distractions from their employment easily avoided by a trial in Milwaukee County, where the conduct at issue in this case allegedly occurred.

It is the State of Wisconsin, not the State of Illinois, that has the most significant interest in this putative class action against the Artisan Defendants. The Artisan Defendants are headquartered there; the relevant documents are maintained there; nearly all of the witnesses reside and work there; and the allegedly tortious conduct occurred there. Accordingly, these private and public interest factors outweigh any interest which the State of Illinois may have in providing a judicial forum for one of its citizens.

Predicating *in personam* jurisdiction on the presence of, and alleged injury to, the plaintiff in this State would constitute exactly the kind of "no-holds-barred long-arm jurisdiction" which the Illinois Supreme Court warned in <u>Green</u> "would not pass muster under the due process requirements applicable to long-arm jurisdiction." 86 Ill. 2d at 439. For this reason, and for the other reasons set forth above, this action should be dismissed as to the Artisan Defendants for lack of personal jurisdiction.

**B.    ALTERNATIVE MOTION TO STRIKE AND DISMISS PURSUANT TO SECTION 2-615 OF THE ILLINOIS CODE OF CIVIL PROCEDURE**

### 1.    Plaintiff Parthasarathy's Claims Against the Artisan Defendants Should be Dismissed for Improper Joinder

In proper circumstances, multiple plaintiffs and defendants may be joined in one action. "The objective of joinder is the economy of actions and trial convenience." <u>Boyd v. Travelers Ins. Co.</u>, 166 Ill. 2d 188, 199 (1995). However, where multiple plaintiffs or multiple defendants have been joined improperly in a single action, they may be dismissed by the court. *See* 1A NICHOLS CIV. PRAC. § 10:175; <u>Rodriguez v. Credit Sys. Specialists, Inc.</u>, 17 Ill. App. 3d 606, 612-13 (1st Dist. 1974) (affirming dismissal of misjoined co-plaintiffs).

19

Sections 2-404 and 2-405 of the Illinois Code of Civil Procedure, 735 Ill. Comp. Stat. 5/2-404 and 2-405, govern the permissive joinder of multiple plaintiffs and defendants, respectively. Although the wording of the two statutes differs somewhat, the Illinois Supreme Court has held that their application requires essentially the same analysis. "Joinder of multiple plaintiffs and of multiple defendants now depends broadly upon the assertion of a right to relief, or a liability, arising out of the *same transaction* or *series of transactions* and the existence of a common question of law or fact." Johnson v. Moon, 3 Ill. 2d 561, 567 (1954) (emphasis supplied). Thus, "[t]he determining factors are [1] that the claims arise out of clearly related 'transactions' and [2] that there is in the case a significant question of law or fact that is common to the parties." Boyd, 166 Ill. 2d at 199.

Plaintiff Parthasarathy's claims against the Artisan Defendants arise out of a transaction or series of transactions separate and distinct from the transactions allegedly giving rise to plaintiffs Woodbury's and the Smiths' claims against the T. Rowe Price Defendants and the AIM Defendants, respectively. Each plaintiff asserts independent claims (necessarily pleaded in separate counts) against a separate pairing of mutual fund defendants arising from that particular plaintiff's purchase and ownership of shares in his or her chosen mutual fund. The Complaint does not allege any common contractual relationship among plaintiffs and defendants, nor does it allege any collusive or joint behavior by defendants directed against each of the plaintiffs. To the contrary, Parthasarathy alleges that the Artisan Defendants "breached...duties...to Plaintiff Parthasarathy and similarly situated owners of the *Artisan International Fund*...." (Compl., ¶ 60; emphasis supplied) There is no allegation that the Artisan Defendants breached any duties to shareholders in *other*, competing mutual funds -- nor could they have any duties to such shareholders. Likewise, neither the T. Rowe Price Defendants nor the AIM Defendants are

20

alleged to have breached any duties to plaintiff Parthasarathy. Plaintiffs' claims against each pair of mutual fund defendants are based upon shareholder relationships and alleged duties specific to that pair, and no other.

The respective plaintiffs contend that the mutual fund defendants against which they have asserted claims violated their *own* policies and procedures governing the valuation of their respective (and different) portfolios of foreign securities and the pricing of their respective fund shares.[6] (Compl., ¶¶ 60(ii), 73(ii), 86(ii)) Separate instances of similar conduct independently engaged in by *different* defendants and affecting *different* plaintiffs, do *not* constitute the "same transaction or series of transactions" required for joinder. Rodriguez, 17 Ill. App. 3d at 612-13 (victims of defendants' fraudulent scheme could not join together as co-plaintiffs in a single action where defendants' fraudulent representations, though similar, were not identical, the representations were made at different times, and plaintiffs entered into separate contracts with the defendants); Dorsey v. Material Serv. Corp., 9 Ill. App. 2d 428, 431-32 (1st Dist. 1956) (four quarry operators were misjoined in a single action alleging that their excessive use of explosives at different quarries damaged plaintiffs' property).

Because the Complaint in this case fails to meet the threshold requirement for permissive joinder, it must be dismissed for improper joinder of claims and parties. Gibbs v. Harmony Sys., Inc., 44 Ill. App. 2d 37, 46-47 (1st Dist. 1963) (dismissal affirmed where plaintiffs improperly "lump[ed] together" two separate causes of action, the first by one group of plaintiffs against a group of vending companies and a finance company and the second by a different group of plaintiffs against a different group of vending companies and a different finance company). Moreover, dismissal would serve the interests of justice in that allowing this case to proceed

---

[6]   There is no allegation that the respective mutual funds have the same valuation policies and procedures.

21

against three different pairs of mutual fund defendants would unnecessarily burden the litigants, the Court, and the jurors who ultimately hear the case. In this regard, the conduct of discovery alone would be complicated enormously by the maintenance of claims by three unrelated plaintiffs against three discrete pairs of mutual fund defendants. Plaintiffs already have served discovery on each pair of mutual fund defendants covering a breathtaking range of issues. Although document discovery and deposition testimony would reveal information admissible in evidence only as to a particular pair of defendants, counsel for each of the defendants nonetheless would be required to be familiar with all discovery in the case. In addition, each pair of mutual fund defendants would be required to participate in and bear the expense of a massive trial, two-thirds of which would largely be unrelated to them. The jury and Court also would unfairly be required to keep straight three different sets of facts, valuation procedures, and legal arguments -- creating a substantial risk of prejudice to the defendants.

For all of these reasons, the Complaint should be dismissed for improper joinder.

**2.     Federal Law Preempts Plaintiff Parthasarathy's Asserted State Law Claims Challenging the Method by Which the Artisan Defendants Allegedly Valued Portfolio Securities and Calculated the NAV of Artisan International Shares.**

The gravamen of the Complaint is that the Artisan Defendants negligently (or according to Count II, willfully and wantonly) calculated NAV per share on a daily basis using closing market prices of foreign portfolio securities which ostensibly did not represent the "fair value" of those securities. The method of valuing portfolio securities and calculating current NAV for purposes of the sale and redemption of mutual fund shares is set forth in and governed by the ICA and in SEC Rules promulgated thereunder. *See, e.g.,* 15 U.S.C. §§ 80a-2(a)(41), 80a-22(c); 17 C.F.R. §§ 270.2a-4, 270.22c-1, 270.22e-2. Federal law *requires* the use of closing market prices to value foreign portfolio securities when such prices are readily available, and, when such prices are not readily available, permits a mutual fund's board of directors to determine the value

22

of portfolio securities in good faith. 15 U.S.C. § 80a-2(a)(41)(B). Conversely, there is no requirement that a fund must adjust the closing market prices of foreign portfolio securities to reflect upward or downward movements in the U.S. domestic securities markets. Because federal law specifies the manner in which fund portfolio securities are valued and NAV is calculated, any purported state law claims concerning the same subject matter are preempted by the Supremacy Clause of the United States Constitution.

The Illinois Supreme Court thoroughly considered and applied preemption principles in Orman v. Charles Schwab & Co., Inc., 179 Ill. 2d 282 (1997), in which the Court held that Illinois common law breach of fiduciary duty and breach of contract claims were implicitly preempted by federal law because those claims conflicted with the purposes and objectives of Congress in enacting the Securities Exchange Act of 1934 (the "Exchange Act"). *Id.* at 284.[7] In Orman, plaintiffs sued several discount securities brokerage firms on behalf of a putative nationwide class of customers of the firms, alleging that the defendants' failure to remit to the plaintiffs order flow payments received in the execution of plaintiffs' securities transactions constituted a breach of fiduciary duty and breach of contract. *Id.* Plaintiffs argued, *inter alia,* that because the Exchange Act provides that the rights and remedies created under that Act are cumulative with all other rights at law and in equity, and because no provision of the Exchange Act or the SEC's implementing regulations expressly prohibits application of state law to broker-customer relationships (*i.e.,* complete preemption did not exist), there could be no preemption of their state common law claims. *Id.* at 292-93.

---

[7]     In dismissing such fiduciary duty and contract claims, the Illinois Supreme Court joined the majority of the state courts which have considered the issue. *See* Orman, 179 Ill. 2d at 296 (*citing* Dahl v. Charles Schwab & Co., 545 N.W. 2d 918 (Minn. 1996); Guice v. Charles Schwab & Co., 674 N.E.2d 282, 290 (N.Y. 1996); McKey v. Charles Schwab & Co., No. BC139314 (Cal. Super. Ct. Sept. 10, 1996); Miller v. Charles Schwab & Co., No. BC137133 (Cal. Super. Ct. Sept. 10, 1996)).

The Illinois Supreme Court rejected plaintiffs' arguments, recognizing that state law claims are preempted not only in the case of express preemption by federal statute, but also where "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' as manifested in the language, structure and underlying goals of the statute at issue." *Id.* at 293-94 (*citing* Hines v. Davidowitz, 312 U.S. 52, 67-68 (1941)). Where such a conflict exists, the Supremacy Clause of the United States Constitution mandates that an act of Congress or regulation issued pursuant to a legislative grant of rule-making authority must supersede state law. *Id.* at 285 (*citing* Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992)). *See also* Hilst v. Gen. Motors Corp., 305 Ill. App. 3d 792, 796 (3d Dist. 1999). *That is exactly the situation in this case.*

The ICA and SEC rules contain several provisions regulating the subject matter of the Complaint in this case, *i.e.*, the valuation of portfolio securities and the calculation of fund NAV per share. Section 2(a)(41)(B) of the ICA defines "value" of the assets of registered investment companies (like Artisan Funds) to mean: "(i) with respect to securities for which market quotations are readily available, the market value of such securities; and (ii) with respect to other securities and assets, fair value as determined in good faith by the board of directors." 15 U.S.C. § 80a-2(a)(41)(B). Thus, where market quotations (such as closing market prices) of foreign securities held in a mutual fund's portfolio are "readily available," those prices *must* be used by the mutual fund in computing NAV -- not some other price based on a different measure of value. It is only when market quotations are deemed not "readily available" that some other measure of value -- determined in good faith by the fund's board of directors -- is permissible or may be required.

This definition of "value" under the ICA is incorporated nearly verbatim into SEC Rule 2a-4. That Rule defines a fund's current net asset value as "an amount which reflects calculations...made substantially in accordance with" the requirements set out in the rule, including: "Portfolio securities with respect to which market quotations are readily available shall be valued at current market value, and other securities...shall be valued at fair value as determined in good faith by the board of directors," essentially a restatement of ICA Section 2(1)(41)(B).    17 C.F.R. §270.2a-4.    Another Rule prohibits mutual funds from selling, redeeming, or repurchasing fund shares "except at a price based on the current net asset value of such security" computed after the receipt of a tender of shares for redemption or an order to purchase or sell shares. 17 C.F.R. § 270.22c-1.

The ICA and the Regulations issued by the SEC together establish a body of paramount federal law regulating the entire field of portfolio valuation and NAV calculation for purposes of the purchase and redemption of mutual fund shares, leaving no room for state regulation of these subjects through the *ad hoc* application of state tort, fiduciary duty, or other common law principles. *The Complaint in this case acknowledges this paramount federal law* governing the calculation of NAV in that it relies upon "*applicable* published regulations" effective "[o]n or about January 1, 1965" -- a reference to SEC Rule 2a-4 under the ICA. (Compl., ¶ 63, 64(i); emphasis supplied)   Subjecting the method for determining NAV to potentially conflicting interpretations of state common law would disrupt the federal regulatory scheme, under which there can be only a *single* nationwide NAV for a class of mutual fund shares. *See, e.g.,* Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 874 (2000) (state common law tort claim alleging a negligent failure to equip automobiles with a driver's side airbag held to be preempted because it conflicted with a Federal Motor Vehicle Safety Standard promulgated by the Department of

Transportation); Burks v. Lasker, 441 U.S. 471, 486 (1979) (court must consider whether state rule is "consistent with the policies of the ICA"); Time Warner Cable v. Doyle, 66 F.3d 867, 878-79 (7th Cir. 1995) (Wisconsin law prohibiting unfair trade practices was preempted by FCC regulation which permitted cable operators to engage in practice in question); Orman, 179 Ill. 2d at 297.[8]

Moreover, a uniform calculation of per-share NAV for shares of the same class is required by federal law for a mutual fund to qualify as a "regulated investment company" under Section 851, *et seq.*, of the Internal Revenue Code. A mutual fund that fails to qualify as a regulated investment company would be subject to taxation as an ordinary corporation, resulting in the imposition of a layer of taxation that would not otherwise be imposed (and reducing returns to shareholders accordingly). The Internal Revenue Code provides that, unless a mutual fund provides all shareholders in the same class with identical rights to receive dividends and redemptions -- which are based on NAV -- the fund will lose its special tax status. 26 U.S.C. §§ 562(c), 852(a), 852(b)(2)(C), 852(b)(3); Treas. Reg. § 1.562-2. Varying state standards for the valuation of portfolio securities and hence the calculation of NAV for shareholders within the same class, which would inevitably result from multiple state law interpretations, would run afoul of these federal regulations, jeopardize a mutual fund's standing as a "regulated investment company," and potentially subject the fund to taxation as an ordinary corporation -- an additional tax burden which would fall on the fund's shareholders. Uniformity

---

[8]      This is not to say that the ICA preempts all state common law claims and remedies in the mutual fund context; it does, however, preempt claims which conflict with or stand as an obstacle to the provisions of the ICA and SEC Regulations. *See* Orman, 179 Ill. 2d at 293-94. *Accord* Time Warner, 66 F.3d at 878 (Seventh Circuit determined that FCC regulation preempted conflicting state cause of action even though the federal statute pursuant to which the regulation was adopted "envisioned a regulatory regime in which cable operators would be subject both to federal requirements...and, at the same time, to the requirements of certain state consumer protection laws").

in NAV per share for shares of the same class also is essential to satisfy the "capital structure" requirements of the ICA. 26 U.S.C. § 851; 15 U.S.C. § 80a-18.

Beyond this, as a practical matter, a uniform NAV calculation is essential to allow the dissemination of price information via electronic databases, websites, stock exchange quotations, and newspaper postings to all shareholders, wherever they may reside. A uniform price (NAV) per share also greatly facilitates recordkeeping for the huge numbers of purchases and redemptions of investment company shares which occur on a daily basis. Varying valuation and NAV calculation methodology by state for shares of the same class would risk a fifty-fold multiplication of prices for the same shares, creating confusion in the minds of investors as well as significant additional expenses that would be borne by fund shareholders.

The ICA contains an express finding by Congress that investment companies "are affected with a national public interest...." 15 U.S.C. § 80a-1. Section 1(b)(5) of the ICA specifically declares that "the national public interest" is affected by methods used by investment companies *to compute their NAV.* 15 U.S.C. § 80a-1(b)(5). Injecting state common law principles into a federal regulatory system that contemplates consistency in the method of portfolio valuation and NAV calculation would be highly disruptive of the federal regulatory scheme. *See* Orman v. Charles Schwab & Co., Inc., 285 Ill. App. 3d 937, 945 (1st Dist. 1996), *aff'd,* 179 Ill. 2d 282 (1997) ("[T]he securities industry is a national market which must be regulated uniformly. To allow plaintiffs' causes of action to survive in the Illinois state courts, the federal uniformity goal will be frustrated, if not destroyed."). *See also* Guice v. Charles Schwab & Co., Inc., 674 N.E.2d 282, 290 (N.Y. 1996) (permitting imposition of liability on national securities firms "for failure to meet more stringent [state] common-law agency

standards...would inevitably defeat the congressional purpose of [developing and protecting a] 'coherent regulatory structure' for a national market system").

The entire focus of this case is the valuation of fund portfolio securities and the consequent calculation of fund NAV per share. These are questions that admit of only one answer -- an answer given solely by federal law. Consequently, any claims under state common law principles which could vary the result dictated by federal law are preempted.

### 3. The Complaint Fails to Plead a Violation of the Federal Requirements Governing the Pricing of Portfolio Securities and the Calculation of NAV.

The Complaint contains no allegations that the valuation methodology plaintiffs would have defendants employ is *required* either by the ICA or the SEC Regulations. (There is no allegation, for example, that federal law requires that the value of foreign portfolio securities must be adjusted to reflect movements in the *U.S.* domestic securities markets.) Conversely, the Complaint fails to allege that the manner in which defendants calculate NAV *violates* any requirement or prohibition of federal law. In the absence of such allegations, the Complaint fails to state a claim under the only body of law -- preeminent federal law -- which could give rise to a cause of action based upon improper calculation of NAV. *See* Robbins v. City of Madison, 193 Ill. App. 3d 379, 383 (5th Dist. 1990) (employee basing retaliatory discharge claim on violation of public policy expressed in Illinois Minimum Wage Law "must allege in his complaint specific facts which, if true, would establish a violation" of that law). *Cf.* Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, 159 F.3d 1209, 1212 (9th Cir. 1998) ("although [plaintiff's] theories are posited as state law claims, they are founded on the defendants' conduct in suspending trading and de-listing the offering, the propriety of which must be exclusively determined by federal law."). Accordingly, Counts I and II of the Complaint should be dismissed.

28

4.     **The Complaint Must be Dismissed for Failure to Allege Compliance With the Demand Requirement Imposed by Wisconsin Law.**

a.     **Plaintiff Parthasarathy's Claims Are Derivative In Nature.**

Plaintiff Parthasarathy alleges that the Artisan Defendants' purported failure to "properly" value Artisan International's portfolio securities afforded opportunities for market timed trading activity, which resulted in the dilution of *Fund assets* (Compl., ¶ 43), increased trading and transaction costs *to the Fund* (Compl., ¶ 45), and had other adverse effects *on Fund* operations and performance. *Id.* The Complaint explains how these alleged injuries to the Fund purportedly affected Fund shareholders:

> When market timing traders are able to buy shares at a discount, *Defendants' fund assets suffer dilution* because the cash received by the fund for the shares purchased is less than the per share value of the underlying foreign securities because of the stale pricing utilized by Defendants. Likewise, when market timing traders are able to sell (redeem) shares at a premium, *Defendants' fund assets suffer dilution* because the cash paid out by the fund for the shares redeemed is more than the per share value of the underlying securities, again due to the stale pricing utilized by Defendants. In both instances, when Defendants receive less cash when issuing and pay out more cash when redeeming market timing trader shares than supported by the value of their underlying foreign securities, the result is *a dilution of Defendants' cash*. Since the cash held by the fund is one of the assets that is valued in setting the Defendants' daily fund NAV, it follows that *the diluted fund cash position causes the NAV to be diluted as well*. Due to the stale pricing utilized by Defendants, long term buy and hold shareholders have incurred *a dilution in the NAV of their shares* and the wealth represented by that diluted amount has been transferred to market timing traders.

(Compl., ¶ 43) (Emphasis supplied)

If Artisan International did sustain the injuries alleged in the Complaint, any claim belongs to the Fund itself, whose assets allegedly were diluted, and *not* to individual shareholders who were injured, if at all, only indirectly. That is, any injury to a shareholder arose only after and to the extent that any injury to the Fund itself (*i.e.*, the dilution of Fund

assets) occurred. Thus, any claim may be asserted only derivatively, rather than by a shareholder suing in his or her individual capacity.

The question whether a suit is derivative by nature or may be brought by a shareholder in his or her own right is governed by the law of the state of incorporation. Lipman v. Batterson, 316 Ill. App. 3d 1211, 1215 (1st Dist. 2000); Spillyards v. Abboud, 278 Ill. App. 3d 663, 667 (1st Dist. 1996). *See also* Kennedy v. Venrock Assoc., 348 F.3d 584, 589 (7th Cir. 2003). Here, Wisconsin law governs because Artisan Funds is incorporated under the laws of that State. (Compl., ¶ 7)

Under Wisconsin law, a claim for diminution in the value of shareholder investments as a result of a reduction in corporate assets (like that alleged in the Complaint in this action) is derivative in nature and may not be pursued in a direct shareholder action. In Rose v. Schantz, 201 N.W.2d 593 (Wis. Sup. Ct. 1972), the Wisconsin Supreme Court held that allegations by a plaintiff shareholder that the defendant officers and directors engaged in a scheme to deplete the corporation of its cash reserves did not support a direct action, even if the diversion of funds had an impact on the value of the stockholders' shares. *Id.* at 597-98. The Schantz court reasoned:

> It appears to us that the only direct injury alleged is to the corporation. It is the corporation's funds that allegedly are to be used to pay off debts before due and to redeem stock. It is the corporation that allegedly will have its working capital impaired. It is the corporation that allegedly will to [sic] longer be able to stay in business. At least, the primary injury set forth is to the corporation, not the individual stockholder bringing the suit.
>
> *That such primary and direct injury to a corporation may have a subsequent impact on the value of the stockholders' shares is clear, but that is not enough to create a right to bring a direct, rather than derivative, action.* Where the injury to the corporation is the primary injury, and any injury to stockholders secondary, it is the derivative action alone that can be brought and maintained. That is the general rule, and, if it were to be abandoned, there would be no reason left for the concept of derivative actions for the redress of wrongs to a corporation.

30

*Id.* (Emphasis supplied)

Subsequent Wisconsin decisions are in accord. *See* <u>Borne v. Gonstead Advanced</u> <u>Techniques, Inc.</u>, 667 N.W.2d 709, 713-14 (Wis. Ct. App. 2003) (claim that shareholder ownership interests were devalued as a result of the transfer of corporation's assets was derivative in nature: "[d]erivative claims are those a corporation could bring because the corporation's assets are affected," and, "even though the value of all stock will be depleted by the plan, that injury is secondary to the corporation's loss of assets"); <u>Reget v. Paige</u>, 626 N.W.2d 302, 308 (Wis. Ct. App. 2001) (to properly state an individual claim, the complaint must demonstrate "an injury that is personal to [plaintiff], rather than an injury primarily to the corporation"); <u>Jorgensen v. Water Works, Inc.</u>, 630 N.W.2d 230, 235 (Wis. Ct. App. 2001) (injury is primarily an injury to a shareholder "if it affects a shareholder's rights in a manner distinct from the effect upon other shareholders"). *See also* <u>Flynn v. Merrick</u>, 881 F.2d 446, 449 (7th Cir. 1989) (Seventh Circuit, applying Wisconsin law, affirmed the dismissal of shareholder claims arising out of conduct which allegedly diminished the value of the plaintiffs' investments in a Wisconsin corporation).

Illinois courts likewise repeatedly have affirmed the dismissal of shareholder actions alleging, as here, a diminution in value of their shares as the result of what amounts to mismanagement. <u>Lipman</u>, 316 Ill. App. 3d at 1216 ("[p]laintiffs allege that defendants' mismanagement caused 'precipitous decline' in the price of their stock. Accordingly, plaintiffs' complaint is derivative in nature."); <u>Small v. Sussman</u>, 306 Ill. App. 3d 639, 644 (1st Dist. 1999) (plaintiff's claim alleging the waste of corporate assets affected shareholders indirectly and therefore could only be maintained as a derivative suit); <u>Spillyards</u>, 278 Ill. App. 3d at 674 (plaintiff's claims that defendants failed to adequately shop for buyer of corporation and that

"consideration for the stock could have been increased had the sale occurred in a more competitive atmosphere" were derivative in nature); Seinfeld v. Bays, 230 Ill. App. 3d 412, 423 (1st Dist. 1992) ("[c]laims of devaluation of stock and of corporate waste are claims which accrue to the corporation rather than to individual shareholders. Such suits must be brought derivatively..."); Kennedy v. First Nat'l Bank of Decatur, 129 Ill. App. 3d 633, 637 (4th Dist. 1985) ("shareholders of the corporation injured by virtue of the diminution in value of their shares may not recover directly for their losses, but are compensated indirectly if the corporation recovers because its assets are replenished"). Moreover, a shareholder cannot avoid this result by purporting to assert a claim directly against the corporate entity since there is no general fiduciary duty owed by a corporation to shareholders. Anchor Realty & Inv. Co. v. Rafferty, 308 Ill. App. 484 (1st Dist. 1941). Nor does an investment adviser to a mutual fund owe its duties directly to shareholders, absent a special relationship between the adviser and fund shareholders. Olesh v. Dreyfus Corp., No. CV-94-1664, 1995 WL 500491, *7 (E.D.N.Y. Aug. 8, 1995).

The derivative issue was addressed briefly by the Honorable David R. Herndon in his January 30, 2004 Memorandum and Order remanding this case to Circuit Court. Parthasarathy v. T. Rowe Price Int'l Funds, Inc., No. 03-cv-00673-DRH, slip op. at 6-8 (S.D. Ill. Jan. 30, 2004). In that Order, Judge Herndon adopted the analysis of another District Court judge in Bradfisch v. Templeton Funds, Inc., No. 03-CV-0760 (MJR), in which the court concluded that "[plaintiff's] reduced equity value in the fund did not result from a reduction in fund assets but from a reallocation of equity value to the market time traders who bought the fund's undervalued shares." Bradfisch v. Templeton Funds, Inc., No. 03-cv-0760-MJR, slip op. at 4-5 (S.D. Ill. Jan. 23, 2004). While the Artisan Defendants respectfully suggest that the derivative issue was

32

incorrectly decided in <u>Bradfisch</u>, the Parthasarathy Complaint *does* expressly allege a claim for dilution of the NAV of plaintiff's shares as a result of a reduction *in Fund assets. It is the nature of the wrong plaintiff alleges in the body of the Complaint* that the Court must consider in performing the derivative analysis. <u>Miller v. Loucks</u>, No. 91 C 6539, 1992 WL 329313, \*1 (N.D. Ill. Nov. 5, 1992); *see also* 12B WILLIAM FLETCHER, FLETCHER CYCLOPEDIA OF PRIVATE CORPORATIONS, § 5911 (2003).[9]

Here, any alleged injury to the plaintiff, as an Artisan International shareholder, could have derived only from an injury sustained by the Fund in which he held shares, and was not distinct from any injury purportedly suffered generally by all Artisan International shareholders -- each of whom would be affected equally according to their respective ownership interests. <u>Flynn</u>, 881 F.2d at 449; <u>Rose</u>, 201 N.W.2d at 597-98. Consequently, under controlling Wisconsin law, the claims asserted in the Complaint are derivative, not direct claims.

### b. Shareholder Demand Is Universally Required In Wisconsin.

In <u>Kamen v. Kemper Financial Services, Inc.</u>, 500 U.S. 90, 108-09 (1991), the United States Supreme Court held that state law properly regulates the allocation of corporate powers between directors and individual shareholders, and hence governs the circumstances under which shareholder demand is required as a prerequisite to suit on a claim properly belonging to the corporation (*i.e.,* a derivative claim). Since at least 1991, Wisconsin law has imposed an absolute requirement that a shareholder make a demand upon the corporation before bringing suit on a claim belonging to the corporation; any alleged futility of demand is no excuse for failing to make demand. Wisconsin law provides:

---

[9]     Because Judge Herndon's ruling on the derivative issue was not a final, appealable order, it is not the law of the case for purposes of Illinois law. *See, e.g.,* <u>Arnold Schaffner, Inc. v. Goodman</u>, 73 Ill. App. 3d 729, 732 (1st Dist. 1979).

> No shareholder or beneficial owner may commence a derivative proceeding until all of the following occur:
>
>> (1)    A written demand is made upon the corporation to take suitable action.
>>
>> (2)    Ninety days expire from the date on which the demand was made, unless the shareholder or beneficial owner is notified before the expiration of 90 days that the corporation has rejected the demand or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

WIS. STAT. § 180.0742.

In Boland v. Engle, 113 F.3d 706 (7th Cir. 1997), the United States Court of Appeals for the Seventh Circuit affirmed the dismissal of derivative claims for failure to make demand on the board of directors of the defendant company. In analyzing how the Indiana Supreme Court might resolve the demand issue before them, the Seventh Circuit recognized that eleven states, *including Wisconsin*, "have statutorily imposed a universal demand requirement" (*i.e.*, a requirement without a "futility" exception to demand). *Id.* at 712. The Seventh Circuit emphasized "the general trend in the law towards narrowing, if not eliminating, the exceptions from the demand requirement" and that "[r]equiring demand thus serves as a valuable screen of potential lawsuits, both by giving corporations a crack at resolving shareholder complaints before litigation and by giving courts more information on which to decide the merits of those suits that remain after demand." *Id.*

In this case, the Complaint makes no allegation that plaintiff made demand upon Artisan Funds prior to the filing of this action. Absent compliance with the demand requirements of the Wisconsin statute, this action must be dismissed. Spillyards, 278 Ill. App. 3d at 681 (a complaint not in compliance with derivative pleading requirements must be dismissed).

34

## 5.   Counts I and II are Barred by the Economic Loss Doctrine

The negligence and "willful and wanton" claims asserted in Counts I and II of the Complaint seek recovery for purely economic loss. As such, both claims contravene the Illinois economic loss doctrine articulated in Moorman Manufacturing Company v. National Tank Company, 91 Ill. 2d 69, 85-86 (1982), and many subsequent Illinois Supreme Court cases.[10]   The legal principle articulated in Moorman and its progeny is that a plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort. Id. That is because "tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law...offer[s] the appropriate remedy for economic loss occasioned by diminished commercial expectations not coupled with injury to person or property." In re Chicago Flood Litig., 176 Ill. 2d 179, 200 (1997) (precluding economic loss portion of class claim for contractor's negligent supervision of pile-driving activity).

Although Moorman involved the sale of goods, the Illinois Supreme Court repeatedly has held that the economic loss doctrine applies to preclude tort claims seeking recovery for economic loss in myriad contexts. See, e.g., Fireman's Fund Ins. Co. v. SEC Donohue, Inc., 176 Ill. 2d 160, 168-70 (1997) (economic loss rule barred claim against engineer for negligent design); 2314 Lincoln Park West Condo. Ass'n. v. Mann, Gin, Ebel & Frazier, Ltd., 136 Ill. 2d 302, 312 (1990) (economic loss rule barred negligence claim for architectural malpractice);

---

[10]     The Complaint does not indicate whether it is purportedly brought under the law of Illinois or some other state, but the Artisan Defendants assume that because this action was filed in Illinois, plaintiffs intend to invoke the law of this State. By addressing the sufficiency of the claims alleged in the Complaint under Illinois law, the Artisan Defendants in no way concede or agree that Illinois law is applicable to the claims of plaintiff Parthasarathy or any other member of the putative class alleged in the Complaint. (In this regard, the Artisan Defendants also have cited in this memorandum Wisconsin authorities recognizing and applying the economic loss doctrine under the law of that state (See, infra n. 11).)  Nor do the Artisan Defendants address here the question of whether the law of any single state could be applied to the claims of absent members of the putative class located throughout the United States.